**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| OAKLAND COUNTY EMPLOYEES' RETIREMENT SYSTEM and OAKLAND COUNTY VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION, individually and on behalf of all others similarly situated,<br><br>                 Plaintiffs,<br><br>     v.<br><br>DEXCOM, INC., KEVIN R. SAYER, JACOB S. LEACH, JEREME M. SYLVAIN, and SEAN CHRISTENSEN,<br>                 Defendants. | Case No. 25-cv-9370<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association ("Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon counsel's investigation, which includes, *inter alia*, review and analysis of: (i) regulatory filings made by DexCom, Inc. ("Dexcom" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued and disseminated by the Company; (iii) analyst reports concerning Dexcom; (iv) information supplied by former Dexcom employees, industry professionals, and other knowledgeable persons described below; and and (v) other public information regarding the Company.

## INTRODUCTION

1.      Plaintiffs bring this securities class action against Dexcom and certain of its current senior executives (collectively, "Defendants") under Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder, on behalf of all investors who purchased or otherwise acquired Dexcom common stock between January 8, 2024, and September 17, 2025, inclusive (the "Class Period").

2.      Dexcom develops, manufactures, and markets continuous glucose monitors ("CGMs"). In early 2023, Dexcom launched the latest generation of its CGM, which it called the G7.

3.      Throughout the Class Period, Defendants repeatedly praised the accuracy and overall performance of the G7, touting it as "the most accurate sensor on the market today," and "the most accurate CGM that has been cleared by the FDA." Defendants expressly attributed the Company's success to the device's performance, claiming that "[y]ou can't achieve results like this, though, without having a great platform, and that's what our G7 is."

4.      Defendants' Class Period representations that the G7 was accurate and high performing were false. In truth, Defendants knew that the G7 product was plagued with quality issues relating to both the accuracy of the sensor, and the sensor's ability to transmit data to the user's chosen receiver or smart device. As a result of Defendants' material misrepresentations and omissions, shares of Dexcom's common stock traded at artificially inflated prices during the Class Period.

5.      The truth began to emerge on July 25, 2024, when Dexcom reported its second quarter results for fiscal year 2024. The Company reported revenue for the quarter below consensus expectations and lowered its revenue guidance for the full year by approximately $300 million. Plaintiffs' investigation demonstrates that a key driver of this revenue miss was that Dexcom was losing market share because of quality issues with the G7. As a result of these disclosures, the price of Dexcom common stock declined by $43.85 per share, or 40.7%.

6.     Then, on March 7, 2025, Dexcom revealed that it had received a warning letter from the SEC "describ[ing] observed non-conformities in manufacturing processes and quality management system."  The letter also warned Dexcom that the Company was selling devices that were "adulterated" because it had modified G6 and G7 sensors by replacing a "component used in the resistance layer of [the] sensors," without FDA approval.  As a result of these disclosures, the price of Dexcom common stock declined by $7.12 per share, or 9.1%.

7.     On September 18, 2025, research firm Hunterbrook Media LLC ("Hunterbrook") published a report detailing incidents of G7 users being hospitalized or dying as a result of incorrect blood glucose readings from their G7 devices.  This report included information from former Dexcom employees, healthcare experts, and G7 users, as well as documents from the FDA investigation that had prompted the March 2025 warning letter.  As a result of these disclosures, the price of Dexcom common stock declined by $8.99 per share, or 11.8%, over the following two trading sessions.

8.     As a result of Defendants' wrongful acts and omissions, which caused the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa, and 28 U.S.C. § 1391(b). The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District. Dexcom's common stock trades on the NASDAQ, which is headquartered in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

12.     Plaintiffs Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association are employee benefit plans for employees and retirees of Oakland County, Michigan. As indicated in the attached Certification, Plaintiffs purchased shares of Dexcom common stock at artificially inflated prices during the Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein.

13.     Defendant Dexcom develops, manufactures, and markets CGMs for diabetics to monitor their blood glucose levels. Dexcom is incorporated in Delaware and maintains its principal executive offices at 6340 Sequence Drive, San Diego, California. Dexcom's common stock trades on the NASDAQ, which is an efficient market, under ticker symbol "DXCM." As of July 23, 2025, Dexcom had over 392 million shares of common stock outstanding, owned by hundreds or thousands of investors.

14.     Defendant Kevin R. Sayer ("Sayer") is, and was at all relevant times, Dexcom's Chief Executive Officer ("CEO") and Chairman of the Board of Directors. Between September 14, 2025, and the end of the Class Period, Defendant Sayer was on a temporary leave of absence.

15.     Defendant Jacob S. Leach ("Leach") is, and was at all relevant times, Dexcom's

Chief Operating Officer ("COO"). Between September 14, 2025, and the end of the Class Period, Defendant Leach also served as Dexcom's interim principal executive officer, while Defendant Sayer was on a temporary leave of absence.

16.     Defendant Jereme M. Sylvain ("Sylvain") is, and was at all relevant times, Dexcom's Chief Financial Officer ("CFO").

17.     Defendant Sean Christensen ("Christensen") is, and was at all relevant times, Dexcom's Vice President of Finance and Investor Relations.

18.     Defendants Sayer, Leach, Sylvain, and Christensen are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with Dexcom, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## **BACKGROUND**

19.     Dexcom develops, manufactures, and markets CGM devices, which are used by diabetes patients to monitor their glucose levels. The CGM devices are comprised of a small sensor which is inserted under the skin and a connected reusable transmitter which sends real-time data to a smart device or receiver. Dexcom's latest CGM, the G7, was launched in early 2023 as

an upgrade over the prior G6 model.

20.     In December of 2023, prior to the start of the Class Period, Dexcom changed the material it was using as the sensor membrane coating, swapping from a compound produced by a third-party supplier to an in-house formulation.  The Company did not inform the FDA or investors of this change, despite the fact that it was deviating from the formulation with which the G7 had been granted FDA approval.  According to the FDA, Dexcom was required to obtain approval before CGMs with the new coating were sold in the United States, because there was not equivalency between the performance of the two materials.  Dexcom's own internal studies demonstrated that sensors with the new coating performed worse on "every accuracy metric" and that patients using sensors with this coating "may experience differences in accuracy over the 10.5-day sensor wear period."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

21.     The Class Period begins on January 8, 2024, when Defendant Sayer presented at the JPMorgan Healthcare Conference.  During this presentation, Defendant Sayer provided Dexcom's initial financial outlook for fiscal year 2024 and commented that "[y]ou can't achieve results like this, though, without having a great platform, and that's what our G7 is."  He continued that "for G7, that great science starts with this accuracy.  This is the most accurate sensor on the market today and the most accurate sensor that's ever been produced by us."

22.     A month later, on February 8, 2024, Defendants released Dexcom's results for the fourth quarter of 2023 and held an earnings call to discuss these results with investors.  During that meeting, Defendant Sayer claimed that "G7 is the most accurate CGM ever launched and the market's reception to G7 has been exceptional.  Customers and clinicians have been thrilled with the new form factor, product performance and ease of use."  He also explained that "[o]ne of the

reasons that we've done so well – two things, the accuracy of our sensor and the performance of our sensor over time, but combined with the fact people expect to get a certain amount of days from the sensor and we deliver what we tell them we're going to do."

23.    During this call, Defendant Sylvain represented that "the performance in the back half of the year, a lot of that has to do with being the most accurate sensor launching with the G7 form factor."  He continued that "having the most advanced sensor on the market is the driver" in taking market share.

24.    Also on February 8, 2024, the Company filed its Form 10-K with the SEC.  In the 10-K, Dexcom touted the accuracy of the G7 as a competitive advantage, stating that "Dexcom G7 is the most accurate CGM cleared by the FDA," and that "the capability to measure very low levels of an electrical signal and to accurately translate those measurements into glucose values is also a unique and distinguishing feature of our technology."

25.    During a presentation at the Raymond James Institutional Investors Conference on March 5, 2024, Defendant Christensen expressed that the "significant growth" that the Company was expecting in 2024 was based on the "excellent product" that Dexcom had in the G7.  He told investors that the G7 was the "standard in CGM technology around the world," and "the most accurate CGM that has been cleared by the FDA," which offers "that standard Dexcom performance that people have come to expect and trust over the years."

26.    On April 25, 2024, Defendants announced Dexcom's fiscal year 2024 first quarter results and held a related earnings call.  During the earnings call, Defendant Sayer claimed that the Company's positive momentum since the launch of the G7 "can be directly attributed to our product performance and innovative features."  He further claimed that the G7 "extended our leadership in sensor accuracy," and that the Company "continued to enhance the G7 experience

with ongoing improvements to both the hardware and software platforms."

27.     On June 5, 2024, Defendant Sylvain presented at the William Blair Growth Stock Conference.  During this presentation, he touted the G7 as "the most accurate sensor on the market."

28.     The statements referenced in ¶¶ 21-27 were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, the G7 suffers from significant quality issues relating to both the accuracy of the sensor, and the sensor's ability to transmit data to the patient's chosen receiver or smart device.  In addition, the Company had made unapproved changes to a key component of the G7.  As a result, Defendants' positive statements concerning the G7's accuracy and general performance, and how that was driving the Company's success, were materially false or misleading, as were its claims that the G7 was FDA approved.

## THE TRUTH EMERGES

29.     On July 25, 2024, after the market closed, Dexcom issued a press release announcing its second quarter results for fiscal year 2024.  The press release revealed that Dexcom had missed consensus market expectations for revenue that quarter, and that the Company was lowering full year revenue guidance for 2024 from $4.20 - $4.35 billion to $4.00 - $4.05 billion.

30.     While Defendants attributed the Company's underperformance to various sales execution issues, a former Dexcom employee confirmed that the revenue miss and guidance reduction was actually driven by issues with the G7's performance.  For example, a former Software Engineer who worked as part of the G7 "quality team," from March of 2022 through September of 2024, at Dexcom's San Diego engineering facility, stated that Dexcom's claim that salesforce restructuring was to blame for slower new patient starts was not true.  Instead, he stated

that sales were negatively affected by quality issues plaguing the G7 that, among other things, led to patients being unwilling to upgrade to the G7 from the G6. The former Software Engineer explained that as soon as the G7 came out there were complaints from customers about quality issues. Specifically, he saw prevalent issues where devices were experiencing signal loss, causing the patient's receiver or smart device to not receive data from the sensor.

31. As a result of the revenue miss and guidance reduction, the price of Dexcom common stock declined more than 40%, from a closing price of $107.85 per share on July 25, 2024, to a closing price of $64.00 on July 26, 2024.

32. Following this disclosure, Defendants continued to misrepresent both the real cause of the revenue shortfall and the performance of the G7. During an earnings call held on July 25, 2024, to discuss the Company's second quarter financial results, Defendant Sayer stated that the Company's plan to "enhance our competitive position" "starts with our product portfolio." He further represented that Dexcom has "built upon the performance of G7, making it even better."

33. On October 24, 2024, during an earnings call with investors discussing the Company's results for the third quarter of fiscal year 2024, Defendant Sayer claimed that Dexcom intended to maintain market share "through the higher quality of our product." He further represented that the "accuracy of Dexcom is tried and true and proven to these patients."

34. On February 18, 2025, the Company filed its Annual Report for fiscal year 2024 on Form 10-K with the SEC. In the 10-K, Dexcom touts the accuracy of the G7 as a competitive advantage, stating that "Dexcom G7 is the most accurate CGM cleared by the FDA," and that "the capability to measure very low levels of an electrical signal and to accurately translate those measurements into glucose values is also a unique and distinguishing feature of our technology."

35. The statements referenced in ¶¶ 32-34 were materially false and misleading, and

failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, the G7 suffers from significant quality issues relating to both the accuracy of the sensor, and the sensor's ability to transmit data to the patient's chosen receiver or smart device.  In addition, the Company had made unapproved changes to a key component of the G7.  As a result, Defendants' positive statements concerning the G7's accuracy and general performance, and how that was driving the Company's success, were materially false or misleading, as were its claims that the G7 was FDA approved.

36.    Then, after the market closed on March 7, 2025, Dexcom revealed through a Form 8-K filed with the SEC that it had received a warning letter from the SEC "following inspections of the Company's facilities in San Diego, California, and Mesa, Arizona."  The Company stated that the "warning letter describes observed non-conformities in manufacturing processes and quality management system."  Review of the letter also reveals that the FDA warned Dexcom that the Company was selling devices that were "adulterated" because it had modified G6 and G7 sensors by replacing a "component used in the resistance layer of your sensors," without premarket approval.

37.    As a result of these disclosures, the price of Dexcom common stock declined more than 9%, from a closing price of $77.84 per share on March 7, 2025, to a closing price of $70.72 on March 10, 2025.

38.    In the wake of these disclosures, Defendants continued to misrepresent the quality issues with the G7.  For example, on May 1, 2025, Dexcom held a conference call with analysts and investors to discuss the Company's earnings and operations for the first quarter of 2025.  On that call, Defendant Leach said in response to an analyst question about potential manufacturing issues with sensors that while "sensor issues do happen and we see them on the boards . . . there's

no difference in frequency of those from last year to this year, is we've actually made some improvements in quite a few of them."  He continued that Dexcom was "very comfortable with the product that's flowing off the lines."

39.    On July 21, 2025, Defendant Leach appeared on a podcast called Diabetech and discussed the FDA warnings letter, stating that "there's no actual claim that the performance of the sensor isn't as accurate as the old one," and describing the "real issue" as "the FDA wanted to see us do some different things to be able to qualify [the new sensor coating]."

40.    On September 3, 2025, Defendants Leach and Sylvain participated in a question-and-answer session at the Wells Fargo Healthcare Conference.  When asked about concerns in the market related to G7 reliability and accuracy issues, Defendant Leach responded that it "doesn't reflect what we're hearing from the market," and that "if you look at our metrics, things like warranty replacement, complaint rate, performance of the sensor, accuracy, all of that has continued to improve over time and we haven't seen anything that has changed that trajectory."

41.    The statements referenced in ¶¶ 38-40 were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, the G7 suffers from significant quality issues relating to both the accuracy of the sensor, and the sensor's ability to transmit data to the patient's chosen receiver or smart device.  Reports to the FDA's Manufacturer and User Facility Device Experience ("MAUDE") Database for "serious events" had risen significantly since the G7's launch.  In addition, the FDA warning letter stated that sensors made with the new coating were not as accurate as those made with the old coating.  As a result, Defendants' positive statements concerning the G7's accuracy and general performance, as well as their descriptions of the FDA's warning letter, were materially false or misleading.

42.    On September 18, 2025, research firm Hunterbrook published an investigative report titled "Dexcom's Fatal Flaws," which revealed that "[a]fter inaccurate readings from Dexcom's flagship G7 device, some diabetics are ending up in the ICU — or dead."

43.    The Hunterbrook report included accounts of interviews with former Dexcom employees, healthcare experts, and G7 users expressing concern with the accuracy of the G7 sensor.  For example, the report detailed comments from a "former senior scientist" at Dexcom who "noted the electrochemistry and membrane teams were led by managers with weak scientific credentials," as well as testimony from endocrinologists who had "many patients report issues with the G7."  Hunterbrook also analyzed adverse event reports submitted to the MAUDE database for "serious events," defined as those that involve an injury or death.  The report claimed that this analysis found that "Dexcom's share of accuracy complaints is 22% more than its market share." In addition, Hunterbrook obtained FDA inspection documents relating to Dexcom's March 2025 warning letter that revealed that sensors with the new, unapproved, coating performed worse on "every accuracy metric" and that patients using sensors with this coating "may experience differences in accuracy over the 10.5-day sensor wear period."

44.    These disclosures caused the price of Dexcom common stock to decline by approximately 12% over the following two trading sessions, from a closing price of $76.44 per share on September 17, 2025, to a closing price of $67.45 on September 19, 2025.

**LOSS CAUSATION**

45.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This conduct artificially inflated the price of Dexcom's common stock and operated as a fraud or deceit on the Class (as defined below).  Later, when Defendants' prior misrepresentations and fraudulent

conduct were disclosed to the market, the price of Dexcom's common stock fell precipitously as the prior artificial inflation came out of the price over time.  As a result of their purchases of Dexcom common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws, which were caused by Defendants' material misrepresentations and omissions.

## CLASS ACTION ALLEGATIONS

46.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of Dexcom during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Dexcom and their families and affiliates.

47.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of July 23, 2025, Dexcom had over 392 million shares of common stock outstanding, owned by hundreds or thousands of investors.

48.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)    Whether Defendants' conduct impacted the price of Dexcom common stock;

(g)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)    The extent of damages sustained by Class members and the appropriate measure of damages.

49.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

50.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

51.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

52.    Dexcom's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

53.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer

of Dexcom who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## **PRESUMPTION OF RELIANCE**

54.    At all relevant times, the market for Dexcom's common stock was an efficient market for the following reasons, among others:

(a)    Dexcom common stock met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Dexcom filed periodic public reports with the SEC and NASDAQ;

(c)    Dexcom regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Dexcom was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

55.    As a result of the foregoing, the market for Dexcom common stock promptly

digested current information regarding Dexcom from all publicly available sources and reflected such information in the price of Dexcom common stock.  Under these circumstances, all purchasers of Dexcom common stock during the Class Period suffered similar injury through their purchase of Dexcom common stock at artificially inflated prices and the presumption of reliance applies.

56.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the accuracy and broader quality issues with Dexcom's flagship G7 product, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the cost of the importance of the G7 product to Dexcom's overall business, that requirement is satisfied here.

## CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

57.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

58.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Dexcom common stock at artificially inflated prices.

59.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Dexcom common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

60.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information and misrepresented the truth about the prospects of the Company's lead asset.

61.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Dexcom's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

63.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Dexcom's common stock. Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Dexcom's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

64.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

65.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

66.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

67.     The Individual Defendants acted as controlling persons of Dexcom within the meaning of Section 20(a) of the Exchange Act.   By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Dexcom, the Individual Defendants had the power and ability to control the actions of Dexcom and its employees.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

18

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated: November 10, 2025                    Respectfully submitted,

*/s/ Hannah Ross*
Hannah Ross
Scott R. Foglietta
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiffs Oakland County Employees'
Retirement System and Oakland County Voluntary
Employees' Beneficiary Association*

Aaron L. Castle
**VMT LAW, P.C.**
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578 1201
acastle@vmtlaw.com

*Additional Counsel for Plaintiffs Oakland County
Employees' Retirement System and Oakland County
Voluntary Employees' Beneficiary Association*

## CERTIFICATION PURSUANT TO
## <u>THE FEDERAL SECURITIES LAWS</u>

I, Joseph Rozell, on behalf of Oakland County Employees' Retirement System ("Oakland County ERS") and Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am Chairman of Oakland County ERS and Oakland County VEBA and I am authorized to sign this certification on their behalf. I have reviewed the complaint and authorize its filing by counsel.

2. Oakland County ERS and Oakland County VEBA did not purchase or sell the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Oakland County ERS and Oakland County VEBA are willing to serve as representative parties on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Oakland County ERS's and Oakland County VEBA's transactions in the DexCom, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Oakland County ERS and Oakland County VEBA have sought to serve and were appointed as lead plaintiffs and representative parties on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Steamfitters Local 449 Pension & Retirement Security Funds v.
Extreme Networks, Inc.*, No. 24-cv-5102 (N.D. Cal.)
*Genesee County Employees' Retirement System v.
Driven Brands Holdings Inc.*, No. 23-cv-895 (W.D.N.C.)
*Lamontagne v. Tesla, Inc.*, No. 23-cv-869 (N.D. Cal.)
*In re Sotera Health Company Securities Litigation*, No. 23-cv-143 (N.D. Ohio)
*In re Opendoor Technologies Inc. Securities Litigation*,
No. 22-cv-1717 (D. Ariz.)

6. Oakland County ERS and Oakland County VEBA have served as representative parties on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Oakland County Voluntary Employees' Beneficiary Association v.
Generac Holdings Inc.*, No. 22-cv-1436 (E.D. Wis.)

7. Oakland County ERS and Oakland County VEBA have sought to serve as lead plaintiffs and representative parties on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew their motion for appointment as lead plaintiffs or were not appointed lead plaintiffs:

*In re Dexcom, Inc. Class Action Securities Litigation*,
No. 24-cv-1485 (S.D. Cal.)

8. Oakland County ERS and Oakland County VEBA will not accept any payment for serving as a representative party on behalf of the class beyond Oakland County ERS's and Oakland County VEBA's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __7__ day of November, 2025.

Joseph Rozell
Chairman
*Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association*

**Oakland County Employees' Retirement System**
**Transactions in DexCom, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 6/6/2024 | 21 | 115.2200 |
| Purchase | 6/6/2024 | 20 | 115.2937 |
| Purchase | 6/7/2024 | 202 | 115.5665 |
| Purchase | 6/7/2024 | 8 | 115.4900 |
| Purchase | 6/10/2024 | 105 | 115.4903 |
| Purchase | 6/10/2024 | 84 | 115.8900 |
| Purchase | 6/11/2024 | 232 | 116.5504 |
| Purchase | 6/21/2024 | 2 | 115.4643 |
| Purchase | 6/21/2024 | 121 | 116.4695 |
| Purchase | 6/21/2024 | 5 | 115.8050 |
| Sale | 1/12/2024 | (116) | 125.7883 |
| Sale | 1/12/2024 | (4) | 125.3050 |
| Sale | 3/28/2024 | (190) | 138.7000 |
| Sale | 4/2/2024 | (129) | 136.2482 |
| Sale | 4/15/2024 | (53) | 134.8274 |
| Sale | 4/16/2024 | (150) | 135.7580 |
| Sale | 10/8/2024 | (190) | 69.5150 |
| Sale | 10/8/2024 | (255) | 69.4516 |
| Sale | 10/9/2024 | (1,530) | 69.2373 |
| Sale | 10/10/2024 | (350) | 69.5055 |
| Sale | 10/10/2024 | (50) | 69.5379 |
| Sale | 10/11/2024 | (30) | 70.0000 |
| Sale | 10/11/2024 | (265) | 69.6993 |
| Sale | 10/14/2024 | (30) | 69.8100 |
| Sale | 10/15/2024 | (160) | 67.6767 |
| Sale | 10/16/2024 | (470) | 69.2142 |
| Sale | 11/12/2024 | (75) | 74.4051 |
| Sale | 11/12/2024 | (64) | 74.1896 |
| Sale | 11/13/2024 | (218) | 72.3702 |
| Sale | 11/13/2024 | (119) | 72.5789 |
| Sale | 11/13/2024 | (5) | 72.2600 |
| Sale | 11/13/2024 | (20) | 73.8759 |
| Sale | 11/14/2024 | (198) | 74.0461 |
| Sale | 11/21/2024 | (134) | 74.8776 |
| Sale | 11/22/2024 | (97) | 72.6645 |
| Sale | 11/22/2024 | (129) | 72.9077 |
| Sale | 11/25/2024 | (164) | 76.1101 |

**Oakland County Voluntary Employees' Beneficiary Association
Transactions in DexCom, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 6/6/2024 | 47 | 115.2200 |
| Purchase | 6/6/2024 | 43 | 115.2937 |
| Purchase | 6/7/2024 | 452 | 115.5665 |
| Purchase | 6/7/2024 | 18 | 115.4900 |
| Purchase | 6/10/2024 | 234 | 115.4903 |
| Purchase | 6/10/2024 | 189 | 115.8900 |
| Purchase | 6/11/2024 | 518 | 116.5504 |
| Purchase | 6/21/2024 | 4 | 115.4643 |
| Purchase | 6/21/2024 | 268 | 116.4695 |
| Purchase | 6/21/2024 | 11 | 115.8050 |
| Sale | 1/12/2024 | (193) | 125.7883 |
| Sale | 1/12/2024 | (7) | 125.3050 |
| Sale | 3/28/2024 | (284) | 138.7000 |
| Sale | 4/2/2024 | (280) | 136.2482 |
| Sale | 4/15/2024 | (118) | 134.8274 |
| Sale | 4/16/2024 | (332) | 135.7580 |
| Sale | 10/8/2024 | (550) | 69.4516 |
| Sale | 10/8/2024 | (405) | 69.5150 |
| Sale | 10/9/2024 | (3,350) | 69.2373 |
| Sale | 10/10/2024 | (100) | 69.5379 |
| Sale | 10/10/2024 | (795) | 69.5055 |
| Sale | 10/11/2024 | (55) | 70.0000 |
| Sale | 10/11/2024 | (600) | 69.6993 |
| Sale | 10/14/2024 | (50) | 69.8100 |
| Sale | 10/15/2024 | (350) | 67.6767 |
| Sale | 10/16/2024 | (1,045) | 69.2142 |
| Sale | 10/24/2024 | (366) | 74.8500 |
| Sale | 11/12/2024 | (109) | 74.1896 |
| Sale | 11/12/2024 | (127) | 74.4051 |
| Sale | 11/13/2024 | (370) | 72.3702 |
| Sale | 11/13/2024 | (201) | 72.5789 |
| Sale | 11/13/2024 | (33) | 73.8759 |
| Sale | 11/13/2024 | (10) | 72.2600 |
| Sale | 11/14/2024 | (336) | 74.0461 |
| Sale | 11/21/2024 | (301) | 74.8776 |
| Sale | 11/22/2024 | (219) | 72.6645 |
| Sale | 11/22/2024 | (289) | 72.9077 |
| Sale | 11/25/2024 | (367) | 76.1101 |